UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

ANITA F. ADAMS,              )
                               )
           Plaintiff,         )
                               )
           v.               )     No. 3:20-cv-00143-RLY-MPB
                               )
AZTAR INDIANA GAMING COMPANY,  )
LLC                            )
  d/b/a TROPICANA EVANSVILLE,    )
                               )
           Defendant.     )

**ENTRY GRANTING PLAINTIFF'S MOTION FOR CERTIFICATION**

Plaintiff, Anita Adams, brings several claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and Indiana Wage Payment Statute ("IWPS"), Indiana Code § 22-2-5-1 *et seq.*, against her employer, Defendant Aztar Indiana Gaming Company, LLC d/b/a Tropicana Evansville ("Tropicana").  Adams now seeks to conditionally certify FLSA collective actions under § 216(b) and certify IWPS class actions under Federal Rule of Civil Procedure 23.  For the reasons stated below, the court **GRANTS** Adams's motion, but restricts her IWPS class actions to those employees who currently work for Tropicana or voluntarily resigned from its employ.

I.    **Factual Background**

Since March 2012, Anita Adams has worked at Tropicana, a casino located in Evansville, Indiana.  (Filing No. 56-3, Adams Dep. at 30).  During that time, Adams worked as a Table Games Dealer, a tipped, hourly, non-exempt position.  (Filing No. 25, Def.'s Answer at 4).  Adams, like other employees in the Table Games department, was

1

paid a base wage under $7.25 per hour, with the difference between her base wage and the minimum wage to be made up in tips.  (*See* Filing No. 56-4, Anderson Dep. at 73-74; Adams Dep. at 43).  Tipped, sub-minimum wage workers were also employed in the Food and Beverage, Slots, and Valet departments.  (Anderson Dep. at 73-74).

Adams seeks to conditionally certify FLSA collective actions and certify IWPS class actions based on four of Tropicana's alleged practices.  First, Tropicana allegedly utilized a timeclock rounding practice which systematically caused employees to work time for which they were not compensated.  Second, Adams alleges that Tropicana had no policy or practice in place to meet the FLSA's "tip credit" notice requirements, and Tropicana did not provide such notice to Adams or similarly situated employees.  Third, Tropicana allegedly miscalculated overtime wages by using the sub-minimum base wages of tipped employees instead of the statutory minimum wage.  Finally, Tropicana allegedly required employees to obtain and maintain gaming licenses as a condition of employment and deducted the costs from the employees' paychecks even though those costs were primarily for the benefit of the employer.  Additional facts will be recounted as relevant below.

## II.  Discussion

The court will first discuss whether conditional certification of FLSA collective actions under § 216(b) is appropriate before turning to Adams's proposal to certify IWPS class actions under Rule 23.

### A.      FLSA Collective Actions

An employee who alleges her employer violated the FLSA can bring a cause of action on her own behalf and on behalf of "other employees similarly situated."  29 U.S.C. § 216(b); *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013).  A suit brought on behalf of other employees is known as a "collective action."  *Genesis Healthcare*, 569 U.S. at 69.  "Because the FLSA does not specify how collective actions are to proceed, the management of these actions has been left to the discretion of the district courts."  *Shumate v. Genesco, Inc.*, No. 1:17-cv-03574, 2018 WL 259942, at *2 (S.D. Ind. Jan. 2, 2018) (citing *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989)).

Courts in this district and others commonly employ a two-step process to determine whether an FLSA lawsuit should proceed as a collective action.  *See, e.g.*, *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 438 (S.D. Ind. 2012).  At the first step, the plaintiff need only make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law."  *In re New Albertsons, Inc.*, No. 21-2577, 2021 WL 4028428, at *1 (7th Cir. Sept. 1, 2021).  If the plaintiff meets this standard, the court may conditionally certify the suit as a collective action and allow the plaintiff to send notice of the case to similarly situated employees who may then opt-in as plaintiffs.  *Id.*  At the more stringent second step after discovery is complete, the court must reevaluate the conditional certification and determine whether the plaintiffs are situated similarly enough to proceed to trial or if the conditional certification should be revoked or divided into subclasses.  *Id.*

3

This case is still at the first step. Thus, Adams must make a modest factual showing demonstrating that the potential plaintiffs were victims of a common policy or plan that violated the FLSA.[1] *Id.* The court turns now to Adams's proposed collectives.

### 1.    Timeclock Rounding Collective

The FLSA provides that every employer shall pay covered employees a minimum hourly wage of $7.25 per hour, 29 U.S.C. § 206(a)(1)(c), and a minimum overtime wage of "a rate not less than one and one-half times the regular rate at which he is employed" for each hour worked over forty in a workweek, 29 U.S.C. § 207(a). In calculating these wages, employers are permitted to round employees' timeclocks to regular intervals, "provided that [the timeclock rounding practice] is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(b).

In Count I, Adams alleges that Tropicana had a policy or practice of rounding its employees' timeclocks in a manner that, although neutral on its face, was in fact rigged

---

[1] When substantial discovery has been conducted but has not yet been completed, some courts apply an "intermediate standard" to conditional certification. *See, e.g.*, *Scott v. NOW Courier, Inc.*, No. 1:10-CV-971, 2012 WL 1072751, at *7 (S.D. Ind. Mar. 29, 2012). This standard "permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at th[e] time." *Bunyan v. Spectrum Brands, Inc.*, No. 07-CV-0089, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008). It is not clear what difference this intermediate standard truly makes, and a recent (unreported) Seventh Circuit decision outlining the conditional certification process made no mention of the ostensibly heightened standard. *See In re New Albertsons*, 2021 WL 4028428, at *1. Regardless, it makes no difference here, as the court finds a sound basis for each of the proposed collective actions considering all the evidence. *See MacMann v. Tropicana Ent., Inc.*, No. 4:19 CV 404, 2021 WL 1105500, at *2-4 (E.D. Mo. Mar. 23, 2021) (applying the "not exactly clear" intermediate standard and conditionally certifying four collective actions nearly identical to those proposed here).

toward the casino in violation of the FLSA.  Based on that allegation, she seeks to certify the following collective:

> All hourly, non-exempt Table Games Dealers at Tropicana who clocked in and clocked out using ADP timekeeping software at any time from three years prior to the filing of the Complaint to the present.

(Filing No. 56, Mot. Certify at 2).  For the reasons stated below, the court conditionally certifies the proposed timeclock rounding collective.

### a.       The Timeclock Rounding Collective Is Similarly Situated.

Tropicana's computerized timeclocks track the exact time an employee clocks in or clocks out.  (Anderson Dep. at 114).  But employees' actual clock in or clock out times are rounded up or down to the nearest quarter hour in payroll computations.  (*Id.* at 115).  Thus, an employee who clocks in at 7:53 a.m. will be paid from 8:00 a.m. forward, and an employee who clocks out at 5:37 p.m. will be paid through 5:30 p.m.  (*Id.*).  At all times relevant, Tropicana has had a policy that requires employees to clock in no earlier than seven minutes prior to the start of their scheduled shift and clock out no later than seven minutes after the end of their scheduled shift.  (Filing No. 58-3, Timeclock Rounding Memorandum; Anderson Dep. at 111-14).

Adams alleges that Tropicana's timeclock rounding policy systematically leads employees to work time for which they are not compensated when it is combined with Tropicana's other policies.  Tropicana's "Time Keeping and Time Recording Policy" requires employees to go straight to work after they clock in:

> Once an employee has clocked in for work, he/she is responsible for reporting to his/her work station and starting work.  When a shift has been completed, it is the employee's responsibility to clock out.  Employees who

conduct personal business or [sic] simply not working while clocked in may
be considered "riding the clock" and could be subject to corrective action up
to and including termination.

(Filing No. 58-4, Time Keeping Policy at 1; Adams Dep. at 113; Anderson Dep. at 113-
14 (policy applies to all hourly employees)).  In addition, Tropicana maintains an
attendance policy which assigns employees "attendance points" for being absent or late.
(Filing No. 56-6, 2012 Team Member Handbook at *313; Filing No. 56-7, 2020 Team
Member Handbook at *336; Anderson Dep. at 71 (handbook policies apply to all hourly
employees)).  Receiving ten attendance points in a twelve-month rolling period will result
in the worker's employment being "separated."  (2020 Team Member Handbook at *336).
If an employee clocks in "Tardy Without Notification" even one minute after the shift has
started, they receive half an attendance point.  (*Id.* at *337).

In order to comply with these policies, Adams alleges employees typically must
clock in early and go straight to work.  Because employees are forbidden from clocking
in more than seven minutes prior to the start of their scheduled shift, this pre-shift, on-
the-clock working time is rounded off in payroll computations.  At the same time,
employees do not typically receive the benefit of the rounding system, because Tropicana
requires employees to clock out no later than seven minutes after the end of their
scheduled shifts and prohibits employees from "work[ing] overtime, including late
swipes, without the permission of your supervisor."  (Timeclock Rounding
Memorandum).

Tropicana's primary arguments against conditional certification are that its
managers are given discretion to implement its policies, and countless individualized

inquiries would be required to assess how that discretion was employed and whether employees were actually performing compensable work.  That the policies may have been applied differently is not sufficient to overcome Adams's showing of similarity, at least at the conditional certification stage.  *MacMann v. Tropicana Ent., Inc.*, No. 4:19 CV 404, 2021 WL 1105500, at *4 (E.D. Mo. Mar. 23, 2021).  As to compensability, Tropicana explicitly requires clocked-in employees to start work immediately and prohibits "riding the clock."  (Time Keeping Policy at 1).  Thus, pursuant to Tropicana's written policies, any time spent on the clock should be spent "actually work[ing]."  *See* 29 C.F.R. § 785.48(b) (requiring employers to compensate employees for "all the time they have actually worked").

The court finds that Adams has more than satisfied her modest factual burden to demonstrate that she and potential plaintiffs were victims of a common timeclock rounding policy or practice that violated the FLSA.  *MacMann*, 2021 WL 1105500, at *4;[2] *see also Larson v. Isle of Capri Casinos, Inc.*, No. 16-00902-CV, 2018 WL 6495074, at *15-16 (W.D. Mo. Dec. 10, 2018) (conditionally certifying similar timeclock rounding collective action of all hourly employees at casino)).

---

[2] In *MacMann v. Tropicana Entertainment*, a similar case involving the same lawyers and many of the same arguments made here, the court conditionally certified a timeclock rounding collective; however, the court restricted the collective to non-union employees because "the CBA has specific provisions addressing attendance that vary from [the employer's] standard policy." 2021 WL 1105500, at *4.  Here, in a prior entry, the court rejected Tropicana's argument that the collective bargaining agreement addresses procedures for clocking in or out.  (Filing No. 76, Entry).  And Tropicana has not argued in response to this motion that the timeclock rounding collective should be restricted to non-union members.

### 2.    Tip Credit Notice Collective

As noted above, the FLSA requires employers to pay covered employees a standard minimum hourly wage of no less than $7.25 per hour.  29 U.S.C. § 206(a)(1)(c). Employers may pay tipped employees a sub-minimum base hourly wage and credit the tips as wages to meet the federal minimum, so long as the tips make up the difference between the $7.25 minimum wage and the employee's base wage.  *See* 29 U.S.C. § 203(m).  An employer is only eligible to take this "tip credit" if, among other things, the employer informs the employee of the provisions of § 203(m).  *Id.*

In Count II, Adams alleges that Tropicana violated § 203(m) by failing to properly inform its tipped employees of the provisions under that subsection.  Based on that allegation, she seeks to conditionally certify the following collective:

> All hourly, non-exempt employees at Tropicana who were paid a direct hourly wage that was less than $7.25 per hour and for whom a tip credit was claimed at any time from three years prior to the filing of the Complaint to December 31, 2020.

(Mot. Certify at 1-2).  The court conditionally certifies this proposed collective action.

### a.    The Tip Credit Notice Collective Is Similarly Situated.

Tropicana argues that it satisfied the FLSA's tip credit notice requirements through the following methods: (1) the employee handbook; (2) collective bargaining agreements; (3) federal and state wage and hour posters posted in the facility; (4) information displayed in the employee portal; (5) offer letters; (6) paychecks; and (7) verbal communications during new-hire and department-level orientation.  (Anderson Dep. at 51-53).

Adams has presented sufficient evidence at this stage to show that Tropicana commonly failed to apprise its employees of the provisions of § 203(m) through its written communications.  Several of the written communications relied upon by Tropicana do not even speak to tips.  (2020 Team Member Handbook at *327; Filing No. 58-1, Current CBA at *19-20; Anderson Dep. at 69–71, 76–81, 90–92).  The federal and state labor law posters—which are not prepared by Tropicana and which it is required to post—do speak to tips.  (Anderson Dep. at 86–87).  However, Tropicana does not know whether its employees review the posters, (*id.* at 90), and courts have held that similar posters may fulfill other federal requirements but "are not sufficient to meet the specific obligation of § 203(m)," *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 803 (N.D. Ill. 2013).

Tropicana relies heavily on its verbal communications with employees to defeat certification.  It attempts to walk a fine line by arguing that it fulfilled the tip credit requirements in its conversations with all tipped employees through the interview process and in new-hire and department-level orientations,[3] but that there was no "common policy" because those conversations were "individualized" and "anything but uniform or common."  (Def.'s Resp. at 10-11).  Indeed, Adams's contention is that "there was *no*

---

[3] While Tropicana now contends that it also met its tip credit notice obligations in conversations in interviews, its corporate representative testified that the verbal conversations it relied on were "[t]he orientations [and] the department level training[s].  That's it."  (Anderson Dep. at 53).  Regardless, the employer has the burden to show it met its tip credit requirements, *Driver*, 917 F. Supp. 2d at 800, and the Tropicana's declarations do not support an inference that it complied with § 203(m) as explained by the Department of Labor in 29 C.F.R. § 531.59(b).  (*See* Middleton Decl. ¶¶ 6–9; Eaton Decl. ¶¶ 6–9).

*policy* in place for ensuring compliance with the FLSA's tip credit notice requirements."
(Filing No. 59, Pl.'s Mem. at 6 (emphasis in original)).

The evidence before the court suggests that there was no policy in place to ensure
compliance with § 203(m), and the verbal communications in orientations and
department-level meetings were insufficient to inform at least some tipped employees of
the tip credit information.  When Adams was starting at Tropicana, she was told her pay
would be $4.50 per hour, plus tips.  (Adams Dep. at 43).  She testified that she was not
informed about the tip credit or the details of her compensation at the casino-wide
orientation.  (*Id*. at 64–65).  While Adams does not have personal knowledge about the
compensation of tipped employees in other departments, (*id.* at 65), an employee in
another department testified that she was only told she would be paid $4.00 plus tips and
was not informed of a tip credit.  (Filing No. 56-12, Bradburn Decl. ¶¶ 3-7 (Food and
Beverage department)).  Moreover, it is difficult for Tropicana to maintain that it reliably
informed its employees about the tip credit in these conversations when it also insists that
the conversations were "anything but uniform," "ad-lib," and "varie[d]."  (Def.'s Resp. at
11-12; *see also* Filing No. 70-3, Middleton Decl. ¶ 7; Filing No. 70-4, Eaton Decl. ¶ 7).

Tropicana's reliance on oral notification is insufficient to defeat conditional
certification.  *MacMann*, 2021 WL 1105500 at *3.  And while some courts have
restricted the collective where the plaintiff did not submit evidence showing that there
was a common failure of oral notification across departments, *id.*, this court is not
persuaded to do so here.  Adams has presented sufficient evidence at this stage to show
that Tropicana's six written methods were apparently deficient and employees from two

10

different departments (Table Games and Food and Beverage) were not verbally informed of the provisions of § 203(m).  There is a sound basis to permit the plaintiffs to proceed collectively in the claim that there was a casino-wide failure to comply with the tip credit requirements.  As one court in the District of Kansas recently put it:

> In a sense, there *is* a common policy. It's Boyd Gaming's alleged common failure to follow the law. Surely, no one would expect defendants or any other company to inscribe as much onto a plaque for all of the world to see. That's not how omissions work.

*James v. Boyd Gaming Corp.*, 522 F. Supp. 3d 892, 913 (D. Kan. 2021) (emphasis in original).

Adams has met her modest factual burden at this stage to show that she and other tipped, sub-minimum wage employees at the same casino are "similarly situated" in the sense that Tropicana commonly omitted the necessary tip credit information under § 203(m) in its written and verbal communications with such employees.  *See* 29 U.S.C. § 216(b); *James*, 522 F. Supp. 3d at 913-14 (conditionally certifying a similar collective across several different casinos operated by a single owner); *see also MacMann*, 2021 WL 1105500 at *3 (conditionally certifying similar collective but only as to table games dealers).  *But see Roberts v. Apple Sauce, Inc.*, 945 F. Supp. 2d 995, 1004 (N.D. Ind. 2013) (permitting claim to go forward but denying conditional certification where only evidence regarding lack of tip credit notice was plaintiff's affidavit).  Should it become clear that the verbal communications differed meaningfully from department to department, the court may decertify the collective or divide it into sub-classes at the more stringent second step.

### 3.      Miscalculated Regular Rate Collective

The FLSA provides that every employer shall pay covered employees a minimum overtime wage of "a rate not less than one and one-half times the regular rate at which he is employed" for each hour worked over forty in a workweek.  29 U.S.C. § 207(a).  So, if no valid tip-credit is claimed, the overtime rate should be at least $10.87 per hour (1.5 times the $7.25 minimum wage).  Where an employer claims a valid tip credit, "a tipped employee's regular rate of pay includes the amount of tip credit taken by the employer per hour."  29 C.F.R. § 531.60.  An employer who claims a tip credit must pay an overtime rate of $10.87 per hour minus the value of the tip credit.  *Garcia v. Saigon Mkt. LLC*, No. 15-CV-9433, 2019 WL 4640260, at *8 (S.D.N.Y. Sept. 24, 2019) ("Where a valid tip credit has been taken, the minimum overtime cash wage is the employee's regular rate of pay before subtracting any tip credit, multiplied by one and one-half, minus the tip credit.") (internal quotation marks and citations omitted).

In Count III, Adams alleges that Tropicana violated the FLSA by multiplying the sub-minimum direct cash wages of tipped employees by one and one-half in its overtime computations.  She seeks to certify the following collective:

> All hourly, non-exempt employees at Tropicana who were paid a direct hourly wage that was less than $7.25 per hour and worked more than 40 hours in any workweek from two years prior to the filing of the Complaint to the present.

(Mot. Certify at 3).  The court will conditionally certify this collective action.

### a.    The Miscalculated Regular Rate Collective Is Similarly Situated.

From June 18, 2017, to the present, Tropicana has calculated the overtime rate for its tipped employees for whom it claims a tip credit by multiplying their sub-minimum base wage by one and one-half.  (Anderson Dep. at 98-100).  Regardless of whether Tropicana claims a tip credit for a tipped employee, it still pays such employees time and a half their base rate.  (*Id.* at 102).  Tropicana has never considered computing overtime using the federal minimum wage as the employee's regular rate of pay instead of using the sub-minimum base rate.  (*Id.* at 106-07).  Tropicana has calculated overtime the same way for all hourly employees during the relevant time period.  (*Id.* at 106).

Adams has comfortably met her burden to present facts showing Tropicana had a common policy of calculating overtime wages in a manner that violates the FLSA. *MacMann*, 2021 WL 1105500 at *4 (certifying similar collective action).  Tropicana's argument that these claims would require the court to analyze each of the potential plaintiffs' pay stubs goes to damages, which does not defeat certification where Tropicana used the same formula for each worker.  *Id.*; *Knox v. Jones Grp.*, 208 F. Supp. 3d 954, 961 (S.D. Ind. 2016), *on reconsideration in part*, No. 1:15-cv-01738, 2016 WL 6083526 (S.D. Ind. Oct. 18, 2016) (rejecting argument that individualized liability analysis renders plaintiffs not similarly situated at step one).

### 4.    Gaming License Deduction Collective

To meet the FLSA's minimum wage, an employer can credit certain expenses as "wages."  *See* 29 U.S.C. § 203(m)(1).  An employer can only credit such expenses as

wages if the expense is "something like board or lodging."  29 C.F.R. § 531.32(a).  In other words, expenses can be credited to meet the minimum wage if they are "ordinary living expenses that one would incur in the course of life outside the workplace." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1243 (11th Cir. 2002).

In Count IV, Adams alleges that Tropicana improperly deducted the costs of its employees' gaming licenses, which are primarily for the benefit of Tropicana and have no value to the employees outside of the workplace.  As these deductions allegedly pushed the employees' pay below the minimum and overtime wages for the weeks in which they were issued, Adams seeks to certify the following collective:

> All hourly, non-exempt employees at Tropicana who were paid a direct hourly wage equal to or less than $7.25 per hour and had a gaming license fee deducted from their wages at any time from three years prior to the filing of the Complaint to the present.

(Mot. Certify at 2).  The court conditionally certifies this collective.

### a.  The Gaming License Deduction Collective Is Similarly Situated.

As a condition of employment at Tropicana, any worker in a position classified as gaming by the Indiana Gaming Commission ("IGC") must apply for and obtain a gaming license from the IGC.  (Anderson Dep. at 30).  Such workers bear the cost of any fees associated with obtaining and renewing that license, but Tropicana pays the fees upfront and asks workers to fill out a payroll deduction form so that Tropicana can reimburse itself.  (*Id.* at 30-32).

Gaming licenses are not transferrable; Tropicana employees cannot use them to work at another casino.  (Filing No. 56-9, Guerry Dep. at 41).  Even if they could,

Tropicana requires its employees to return the license to it at the conclusion of their employment. (*Id.*). From June 18, 2018, to the present, Tropicana deducted from its employees' paychecks certain fees associated with different types of gaming licenses. (Anderson Dep. at 24-28). Tropicana would deduct the gaming license fee from the employee's wages regardless of whether an employee made the minimum wage or less. (*Id.* at 41-42).

Tropicana's arguments against certification are that (1) it only makes such deductions for employees who authorize it to do so, and (2) individualized inquiries would be required to determine whether such deductions reduced an employee's wages below the statutory minimums. The first argument goes to the merits, but in any case, the evidence before the court indicates that employees had to authorize the deductions (or pay for the licenses upfront themselves) as a condition of employment. This is enough at the certification stage. *See MacMann*, 2021 WL 1105500, at *3 (certifying similar collective where same authorization argument was made). The second argument, that the court will have to analyze whether the deductions reduced each employee's wages below the minimum, is similarly insufficient to overcome conditional certification. *Id.* at *6 (rejecting the same argument in the more demanding Rule 23 class certification analysis).

Whether the gaming licenses are ordinary costs one would incur in life outside the workplace is a common question capable of being resolved in one stroke. Therefore, the court concludes the gaming license deduction collective is similarly situated. *Id.* at *3; *Lockett v. Pinnacle Ent., Inc.*, No. 19-00358-CV, 2021 WL 960424, at *8-9 (W.D. Mo.

Mar. 12, 2021) (approving parties' stipulation that gaming license deduction collective should be conditionally certified across several casinos).

### B.    IWPS Class Actions

For each of the FLSA claims discussed above except the gaming license claim, Adams seeks to certify a derivative Indiana Wage Payment Statute ("IWPS") claim as a class action. The IWPS requires employers to pay their employees "at least semimonthly or biweekly, if requested, the amount due the employee." Ind. Code § 22-2-5-1(a). Adams alleges that each of the FLSA violations would result, if proved, in an "amount due" under federal law that is recoverable under the IWPS. *See St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele*, 766 N.E.2d 699, 704 (Ind. 2002) (IWPS was intended to govern "not only the frequency but also the amount an employer must pay its employee").

The court will grant certification if Adams satisfies the requirements of Rule 23(a) and the requirements of one of the subsections of Rule 23(b). As many of Tropicana's arguments against certification apply to each class, the court considers each of Adams's proposed classes together.

### 1.    Rule 23(a) Requirements

Every class action must satisfy the four requirements of Rule 23(a), which are: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a)(1)–(4).

### a. Numerosity

Numerosity is satisfied where a class is so large that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). Generally, a class of at least 40 members will suffice. *Gentry v. Floyd Cty.*, 313 F.R.D. 72, 77 (S.D. Ind. 2016).

The least numerous of the three classes Adams proposes is the timeclock rounding class, which consists of hourly Table Games Dealers who clocked out using the computerized timekeeping software from two years prior to the filing of the Complaint to the present. Over the last three years, Tropicana has employed between 80 and 120 Table Games Dealers. (Guerry Dep. at 35). This is a sufficiently large class to satisfy the numerosity requirement, *MacMann*, 2021 WL 1105500, at *6 (numerosity was satisfied where class had between 50-120 members), and Tropicana does not argue otherwise. Likewise, the miscalculated regular rate class and the tip credit notice class are sufficiently numerous, as each contains an excess of 500 members. (Guerry Dep. at 33).

### b. Commonality

Commonality requires questions of law or fact common to the class. *Gentry*, 313 F.R.D. at 77. In other words, the claims of the class must depend on a common contention capable of classwide resolution. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). There need only be one such common question, but it must drive the resolution of the litigation. *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 553 (7th Cir. 2016).

Each of the classes proposed by Adams presents a common question that could "resolve an issue that is central to the validity of each one of the claims in one stroke."

17

*Wal-Mart*, 564 U.S. at 350.  For the timeclock rounding class, one such common question is whether Tropicana's timekeeping policies, which applied to all members of the proposed class, systematically denied employees the benefit of the rounding system and led them to work time for which they were not compensated.  *McClean v. Health Sys., Inc.*, No. 11-03037-CV, 2012 WL 607217, at *3 (W.D. Mo. Feb. 23, 2012) (commonality was satisfied for timeclock rounding claim where employer had uniform timeclock rounding policy).

The tip credit notice commonality inquiry is complicated by the fact that Tropicana relies to some extent on oral notification, but whether the written communications were sufficient to comply with § 203(m) is a common question capable of being resolved in one stroke.  *See Koenig v. Granite City Food & Brewery, Ltd.*, No. CV 16-1396, 2017 WL 2061408, at *4 (W.D. Pa. May 11, 2017) (certifying tip credit notice class where written policies applied uniformly).  Moreover, the verbal communications ostensibly occurred at "orientation" and "department level training." (Anderson Dep. at 53).[4]  In other words, employees are informed of the tip credit requirements at a general session, which all tipped employees are required to attend.  (*See id.* at 64).  While subclasses may become necessary if employees attended different orientations and department training sessions and the information presented at those

---

[4] Should there prove to be significant individual questions of fact regarding the information conveyed during interviews, decertification may be warranted.  But the employer bears the burden of establishing entitlement to claim a tip credit, *Driver*, 917 F. Supp. 2d at 800, and Tropicana's contention that some employees may have been properly informed in verbal conversations is nothing but speculation.

18

sessions substantially differed, whether tip credit information was conveyed at each casino-wide or department-wide meeting appears to be a common question capable of classwide resolution within each potential subclass.

As to the miscalculated regular rate class, whether the formula used by Tropicana to calculate overtime wages complies with the FLSA is a common question central to the validity of the claims. *See MacMann*, 2021 WL 1105500, at *7 (certifying miscalculated regular rate class).

### c.       Typicality

Typicality asks whether the claims of the class representative are typical of the class as a whole. *Gentry*, 313 F.R.D. at 79. A claim is typical of the class if it arises from the same event, practice, or course of conduct that gives rise to the class members' claims and is based on the same legal theory. *Id.* Here, Adams asserts the same legal theory (IWPS violations) based on the same practices or courses of conduct (the timeclock rounding policy, the omission of tip credit information, and the miscalculation of overtime wages) that applied to all members of the proposed classes.

Tropicana argues that typicality is undermined because Adams is a union member and some potential plaintiffs in the proposed class are not union members. As the court concluded in its entry denying Tropicana's motion to dismiss, Adams's claims are independent of her collective bargaining rights and adjudication of her claims would not require interpretation of the governing collective bargaining agreement. (Entry at 12–16). Her union membership does not make her claims atypical of the class.

19

Tropicana also argues that Adams's claims are not typical because a person can only file a claim under the IWPS if she currently works for the defendant or resigned from the defendant's employ. *See Steele*, 766 N.E.2d at 705. Former employees who were terminated lack standing to pursue an IWPS claim. *Neely v. Facility Concepts, Inc.*, No. 1:16-cv-03110, 2017 WL 2378283, at *2 (S.D. Ind. June 1, 2017). This is not enough to defeat certification of an entire class, but the court is persuaded that the IWPS classes should be restricted to those employees who have standing under the IWPS— current employees and former employees who voluntarily terminated their employment. *Schneider v. Union Hosp., Inc.*, No. 2:15-cv-00204, 2016 WL 6037085, at *15 (S.D. Ind. Oct. 14, 2016) (restricting IWPS class to current employees and former employees who voluntarily terminated employment); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (overinclusive class definitions "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis").

Typicality is otherwise satisfied. Tropicana suggests that Adams's claims are not typical of the class because some class members may not have suffered the same injury as she did. For example, some class members may have benefited from the timeclock rounding system. But this goes to the merits. Adams's claim alleges that Tropicana's timeclock rounding policy was used in such a manner that it resulted, "over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(b). Tropicana of course argues that it was not a rigged system and it did not violate the law. Whether the policy was rigged against employees

to deny them the benefit of the rounding system is a central issue common to the class. Adams's claim that she was in fact denied the benefit of the rounding system is indisputably typical of that class.

### d.   Adequacy

The final requirement of Rule 23(a) is adequacy, which requires that the class representative will fairly and adequately protect the interests of the class. *Gentry*, 313 F.R.D. at 80.  "To be an adequate representative of a class, a plaintiff (1) must have a sufficient stake in the outcome to ensure zealous advocacy; (2) must not have antagonistic or conflicting claims with other class members; and (3) must have counsel who are experienced, qualified, and generally able to conduct the litigation." *Id.*   Adams has a sufficient stake in the outcome and no antagonistic or conflicting claims with other class members.  Her counsel also appears experienced, qualified, and generally able to conduct the litigation—especially since her counsel is experienced in wage and hour class actions against casinos. *See e.g.*, *MacMann*, 2021 WL 1105500, at *1 (same plaintiffs' counsel).  Tropicana's arguments against adequacy essentially rehash typicality arguments the court has rejected.  Accordingly, the court concludes Adams will fairly and adequately protect the interests of the class.

### 2.   Rule 23(b)(3) Requirements

In addition to the requirements of Rule 23(a), a plaintiff must satisfy the requirements of one of the subsections of Rule 23(b) before a court will certify a class. Here, Adams seeks to certify three Rule 23(b)(3) classes.  So, she must satisfy two requirements: predominance and superiority.  Fed. R. Civ. P. 23(b)(3).

### a.    Predominance

Predominance requires that common questions of law or fact predominate over questions affecting only individual members.  *Id.*  Predominance is "not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).  It does not ask whether common questions outnumber individual questions.  *Id.*  It simply tests whether the proposed classes are cohesive enough to warrant adjudication by representation. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Tropicana lumps its arguments against predominance together with its arguments against commonality.  It says countless individualized inquiries overwhelm any common questions.  The court disagrees.  As explained above, each of Adams's proposed classes revolves around a common contention capable of classwide resolution, and there is no indication that the classes will not be sufficiently cohesive.  To the extent the tip credit class may be complicated by potential differences between departments or different orientation sessions, that can be handled by subclasses.  *See Butler*, 727 F.3d at 801–02 (different design changes in allegedly defective washing machines and different state laws applicable to claims could be handled by the creation of subclasses).

Other courts have found predominance satisfied when considering similar classes. *MacMann*, 2021 WL 1105500, at *7 (certifying miscalculated regular rate class); *Koenig*, 2017 WL 2061408, at *5 (tip credit notice class); *McClean*, 2012 WL 607217, at *4 (timeclock rounding class).  Although the court in *MacMann* determined that predominance was not met when faced with a similar timeclock rounding class, it did so because each plaintiff would need to show that they were engaged in compensable work

during the rounded off time.  2021 WL 1105500, at *7.  In this case, Tropicana's written policies expressly forbid riding the clock and require employees to go straight to work once clocked in.  Thus, the on-the-clock time prior to each employees' shift is to be spent "actually work[ing]."  *See* 29 C.F.R. § 785.48(b) (requiring employers to compensate employees for "all the time they have actually worked").  Because the compensability concern is not present here and the class was subject to the same uniform timekeeping policies, the court finds predominance satisfied.  *See McClean*, 2012 WL 607217, at *4 (predominance was satisfied in timeclock rounding claim where employees were subject to a uniform timekeeping policy that applied equally to all hourly employees).

### b.    Superiority

Superiority requires that a class action be the superior method of litigation for the fair and efficient adjudication of the controversy.  *Gentry*, 313 F.R.D. at 81.  Relevant considerations in determining superiority include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action

Fed. R. Civ. P. 23(b)(3).

The parties have not pointed the court to any parallel litigation already begun by or against class members, nor is there any apparent reason why concentrating the litigation

in this forum—where the casino is located—would be undesirable.  Likewise, there is no indication that the class members have any interest in individually controlling the prosecution of separate actions.  Indeed, these are exactly the sort of claims that would likely only be brought in a class action.  A lone employee is unlikely to be willing to bear the burdens of litigation to recover for a few rounded off minutes before each shift, even if the employee believes they have a good case.  But if a class of employees sue, it is more worthwhile.  This is a strong indication that a class action is the superior form of litigation here.

Tropicana's only real argument against superiority is that individual questions will make the class unmanageable, but the court has already determined that common questions predominate.  Whether Tropicana's timeclock rounding policies systematically undercompensated employees; whether Tropicana's communications omitted tip credit information; and whether its formula for overtime wages was incorrect are all common questions that can be resolved in one stroke.  Considering those questions for all class members at once instead of on an individual basis is certainly the most efficient way forward, and there is no suggestion that doing so would be unfair.  To the extent that Tropicana argues individualized damages inquiries make the class unmanageable, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."  *Messner*, 669 F.3d at 815.

Because Adams has satisfied each of the requirements of Rules 23(a) and 23(b)(3), the court will certify her three IWPS class actions.  *MacMann*, 2021 WL 1105500, at *7

(certifying miscalculated regular rate class); *Koenig*, 2017 WL 2061408, at *5 (tip credit

notice class); *McClean*, 2012 WL 607217, at *4 (timeclock rounding class).

## III.   Conclusion

The court conditionally certifies each of Adams's proposed FLSA collective

actions under 29 U.S.C. § 216(b).  The court also certifies her three proposed IWPS class

actions under Federal Rule of Civil Procedure 23(b)(3), but it restricts those classes to

employees who currently work for Tropicana or voluntarily terminated their employment.

Adams's Motion to Certify (Filing No. 56) is **GRANTED**, with that limitation.

Tropicana's Motion to Strike Dustin Burkes's declaration (Filing No. 69) is **DENIED AS**

**MOOT**.

The parties are **ORDERED to confer and produce a proposed notice of class**

**certification within 45 days of the date of this Entry**.  If the parties are unable to agree

on a proposed notice, **competing proposals are due 60 days from the date of this**

**Entry**.

**IT IS SO ORDERED** this 25th day of February 2022.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.